Nicolette Glazer Esq. (CSBN 209713)
nicolette@glazerandglazer.com
LAW OFFICES OF LARRY R GLAZER
1999 AVENUE OF THE STARS #1100
CENTURY CITY, CALIFORNIA 90067
T: (310) 407-5353
F: (310) 407-5354

APPOINTED PRO BONO ATTORNEY FOR
PLAINTIFF LAFONZO R TURNER

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| **LAFONZO R. TURNER,** | 2:14-cv-04758 |
| Plaintiff, | **PLAINTIFF'S PRE-TRIAL BRIEF** |
| **v.** | Date: November 5, 2021 |
| | Time: 11:00 a.m. |
| **B. M. CASH, et al.,** | Courtroom: 6C |
| | Judge: The Honorable Stanley Blumenfeld, Jr. |
| Defendants. | Trial Date: November 15, 2021 |
| | Action Filed: 6/19/2014 |

Plaintiff, though Counsel of Record, hereby files this pre-trail brief to update and supplement his Memorandum of Law and Facts and to Reply to some of the issues raised in Defendants' Memorandum of Law and Facts.

1.     The undersigned is not aware of any legal authority issued between the filing of the Plaintiff's Memorandum of Law and Facts and today that directly addresses the issues at bar.

2.     As directed at today's hearing Plaintiff will reply further to Defendants' *Albino* Request for an evidentiary hearing on or before 4 November 2021. As Defendants admitted during today's hearing, the issue of exhaustion -- although an affirmative defense – is to be decided by the court not the jury. It is Plaintiff's position that Defendants have either waived or forfeited their right to an

*Albin*o hearing by failing to request it timely while their motion for summary judgment was under consideration between 2017 and 2019 or in accordance with this Court's scheduling order for dispositive motions.

3.     Defendants' affirmative defenses sounding in common law tort, including but not limited to failure to mitigate damages, estoppel, contributory negligence etc., are not cognizable in the context of a section 1983 claim for Eight Amendment violations. Defendants point to no legal authorities for such affirmative defenses in their filing.

4.     Updated legal position and response to Defendants' affirmative defenses of qualified immunity and that Defendants' actions were reasonably related to achieving legitimate penological goals:

### A. FACTS AND ALLEGATIONS

The operative complaint in this case is the *pro se* Second Amended Complaint [hereinafter 'SAC'] in which Plaintiff, LaFonzo Turner, sued various prison officers under 42 U.S.C. §1983 for excessive force, failure to intervene, deliberate indifference, and retaliation arising from use of excessive force during his confinement at CDCR Lancaster State prison and specifically during a cell extraction on or about 26 June 2010. (ECF #81-1; & 94). It is undisputed that Mr. Turner was at all relevant times a "participant in the mental health care delivery system at the CCCMS level of care." (ECF #111 [Answer] ¶22). As such he is and was at the time of the cell extraction a *Coleman v Wilson (aka Coleman v Brown)* class member. *Coleman v. Wilson*, 912 F.Supp. 1282, 1320 (E.D.Cal. 1995).

The Mental health Services Delivery System (MHSDS) administered by CDCR is divided into five levels of mental health case: hospital and intermediary acute care, psychiatric inpatient program, mental health crisis beds (MHCB), Enhanced Outpatient Program (EOP), and Correctional Clinical Case Management

System (CCCMS). *See* https://www.cdcr.ca.gov/bph/wp-content/uploads/sites/161/2020/10/Mental-Health-Delivery-System-rem.pdf. The CCCMS provides mental health services to seriously mentally ill inmates with stable functioning in the general population, Administrative Segregation Unit (ASU) or Security Housing Unit (SHU) whose mental health symptoms are under control or in "partial remission as a result of treatment." MHSDS Program Guide, 2009 Revision, at 12-1-7. The remaining three levels of mental health care are for seriously mentally ill inmates who, due to their mental illness, are unable to function in the general prison population. The Enhanced Outpatient Program (EOP) is for inmates with "acute onset or significant decompensation of a serious mental disorder." Id.  12-1-7, 12-1-8. Mental Health Crisis Beds (MHCBs) are for mentally ill inmates in psychiatric crisis or in need of stabilization pending transfer either to an inpatient hospital setting or a lower level of care.

In 2010, in order to receive treatment in the MHSDS an inmate had to meet at least one of three general criteria:

1.     Treatment and monitoring are provided to any inmate who has **current** symptoms and/or requires treatment for the **current** Diagnostic and Statistical Manual diagnosed (may be provisional) Axis I serious mental disorders listed below:

> Schizophrenia (all subtypes)
> Delusional Disorder
> Schizophreniform Disorder
> Schizoaffective Disorder
> Brief Psychotic Disorder Substance-Induced
> Psychotic Disorder (exclude intoxication and withdrawal)
> Psychotic Disorder Due To A General Medical Condition
> Psychotic Disorder Not Otherwise Specified
> Major Depressive Disorders
> Bipolar Disorders I and II

2.     Medical Necessity: Mental health treatment shall be provided as needed. Treatment is continued as needed, after review by an IDTT, for all cases in which: Mental health intervention is necessary to protect life and/or treat

significant disability/dysfunction in an individual diagnosed with or suspected of having a mental disorder. Treatment is continued for these cases only upon reassessment and determination by the IDTT that the significant or life threatening disability/dysfunction continues or regularly recurs.

3. Exhibitionism.

In 2009 Mr. Turner was diagnosed with Schizoaffective Disorder, psychosis, depression, extreme paranoia amongst others. ECF # 66 at pp. 5-6. During their deposition Defendants admitted that they were aware of Mr. Turner's CCCMS status. Immediately after the cell extraction Mr. Turner was transferred to a Crisis bed status.

The medical records will also show that since his admission in Lancaster Mr. Turner was a documented asthma patient in need of and using daily an inhaler. *Id.*

The evidence will show that Plaintiff had been put on a 10-day 'cell management status' after he was issued three Rules Violation Reports and on 25 June 2010 he covered up his cell door as an expression of what believed was "a peaceful protest to an unlawful cell management assertion". (*SAC.* at 14, ¶¶ 20-21, 59)[1]

On the morning of 26 June 2010 Defendant Thomas asked Plaintiff to uncover his cell door and "cuff up." (*Id.* at 7.) Plaintiff alleges that he told Defendant Thomas that he was willing to comply and uncover the cell door but felt no need to "cuff up" and asserted his constitutional rights. (Id. at ¶¶26-27) Defendant Thomas used derogatory comments towards Plaintiff, left, and soon

[1] The practice referred to as "Management Status" in 2010 was then part of local operating procedures at LAC and other institutions. As disciplinary measure it was not imposed as part of the disciplinary process but is an alternative sanction imposed as an "indirect response to a set of threatening behaviors to stop those behaviors from continuing." It was thus, predominantly used against mentally ill prisoners. This is "an informal disciplinary procedure where the inmate can be summarily disciplined by being removed from his cell, stripped to his underwear and have all his property removed from his possession" and then placed in a "punishment cage" for up to 72 hours. (Vail Rpt. ¶ 96 part of the Coleman v Brown docket)

after returned with Defendant Cain. (Id. at ¶¶24-25) The two again asked Plaintiff to uncover his cell door but Plaintiff refused. (*Id.*) Cain and Thomas then assembled a cell extraction team. (*Id.* At ¶28)

During their depositions both warden Cash and officer Puckett testified that as reflected in the "official" reports the reason a cell extraction tram was assembled was because Defendants "had not proof of life" and because of the covered door could not observe and confirm Mr. Turner's well-being. Defendant Thomas claimed in his deposition that he never spoke to Plaintiff or received any audible response from Mr. Turner. Officer Puckett and Romero concurred. It could also not be disputed that Mr. Turner could not have complied with the "cuff-up" order even if he was capable to comprehend the order. Although Defendants claim that the extraction was an "emergency/immediate need" intervention the video depicting the cell extraction shows an utter lack of urgency or efforts to confirm that, as Officer Puckett put it, "Turner was not hanging".[2] Defendants waited from 7:20 AM until 13:00 PM to assemble a cell extraction team and instead of removing the barricade to ascertain the well-being of Plaintiff they sprayed Plaintiff's single occupancy cell for full 45 minutes with toxic substances which Defendants knew should not have been used against mentally ill prisoners and/or against those suffering from respiratory illness. *Cf. Dominguez v. Colfax Cty.*, CV 14-875 MV/KRS, 2018 WL 3621018, at *13 (D.N.M. July 30, 2018) (finding sufficient

---

[2] This is so despite repeated efforts by the *Coleman* court and Special Master to bring Defendants in compliance with ordered remedial actions. *E.g.,* Dec. 22, 2000 Order at 4 (requiring Special Master to report on whether defendants have adequate mechanisms for disciplining staff whose conduct contributes to inmate suicide); Oct. 1, 2001 Order at 2 (directing implementation of Suicide Reporting and Review Policy); Jan. 12, 2004 Order at 2-3 (requiring several training and planning measures for suicide prevention); June 10, 2005 Order at 1-2 (Coleman docket # 1668) (requiring implementation of several suicide prevention measures); June 8, 2006 Order at 2-3 (requiring defendants to develop a plan to deal within rising percentage of suicides in administrative segregation and a budget and implementation schedule); Aug. 8, 2006 Stip. & Order at 1-2 (regarding use of video-monitoring for suicide watch observation); Sept. 11, 2006 Stip. & Order at 3 (extending time to submit final plan regarding suicides in administrative segregation).

1   facts to put jailers on notice of inmate's substantial risk of harm where inmate had

2   previous psychiatric history, had previously attempted suicide, was suffering

3   psychosis, and needed medication) It is undisputed that Defendants deployed

4   several cans of chemical agents under Plaintiff's cell at "1305", "1306", "1308",

5   and "1309". ((ECF #111 ¶¶ 25, 44, 46-53, 55-56; ECF #240 (sec. 5)) Defendant

6   Thomas then proceeded to deploy multiple grenades of pepper spray into

7   Plaintiff's cell and Defendant Fears used an "X-10 Barracade Device" to assist in

8   the cell extraction allowing Defendant Thomas to administer more chemical agent

9   directly into the single occupancy cell. Defendants have admitted the frequency

10  and type of chemical agent used in their answer. *Id.*

11          DOM § 51020.15 lists the specific types of pepper spray authorized for use,

12  the number of applications, and the duration of each application. The use of pepper

13  spray and excessive force to induce compliance with orders was at the time of this

14  cell extraction subject to a detailed judgment in *Coleman v. Wilson* and in multiple

15  amended court orders in the decade between 1995 and 2010.

16          Here, Defendants readily admitted during their depositions that no officer

17  was concerned for their safety, or the safety of any other inmates, no fight was in

18  progress, and Mr. Turner was neither aggressive, abusive, or threatening. In fact.

19  Officer Puckett candidly admitted as follows:

20          Q. Do you know why chemical agent was disbursed?

21          A. Yes, to see if he would cuff up. That's what we do first is we use

22          chemical agents to give him a chance to cuff up.

23          Q. How's that going to accomplish the process of cuffing up, can you tell

24  me?

25          A. It makes them very uncomfortable.· It makes you cough and gag and

26  makes your eyes burn.

27          Q. So, the purpose is to make the person uncomfortable so he will comply

28  with the order?

1    ·     A. Yes. (Puckett Depo at 14:21-15:5)

2 Plaintiff alleges that upon entering Defendants Romero and Pollard started striking

3 him with their batons without any provocation while Defendant Spencer held him

4 down with his shield. (*Id.* at ¶49) Plaintiff alleges while he was completely

5 restrained by Defendant Spencer, Defendants Romero and Pollard continued to

6 strike Mr. Turner in the head, face, and upper body with their batons, fists, and also

7 choked him. (*Id.* at ¶¶50) Plaintiff alleges that defendants Fears, Godina, and

8 Puckett then entered the cell and joined in the attack: punching, striking with their

9 batons, and kicking him. (*Id.* At ¶53) The video of the cell extraction does not

10 show the events after the mattress was removed from the door. Officers Romero

11 and Puckett denied using force but claimed that they could not see or observe

12 anything the other officers were doing.

13      Plaintiff alleges that as a result of the attack he suffered a back injury, cuts,

14 bruises, and lacerations to his face, chest, back, arms, and legs, in addition to

15 damage to his lungs from the chemicals. (*Id*. at p.18, [part 4. Injury].)

16 The face laceration is visible on the video. Immediately after the incident Mr.

17 Turner was transferred to a Mental Health Crisis Beds  [part 4. Injury].)

18    **B. PLAINTIFF'S POSITION**

19      "An Eighth Amendment violation is comprised of both an objective

20 component and a subjective component." *Wilson v. Seiter*, 501 U.S. 294, 298

21 (1991). The objective component turns on whether the alleged deprivations are

22 "sufficiently serious" to constitute the "unnecessary and wanton infliction of pain"

23 proscribed by the Eighth Amendment. *Wilson*, 501 U.S. at 298 (quoting *Rhodes v.*

24 *Chapman*, 452 U.S. 337, 346 (1981)). However, "a convicted prisoner's excessive

25 force claim under the Eighth Amendment requires a subjective inquiry into

26 'whether force was applied in a good-faith effort to maintain or restore discipline,

27 or maliciously and sadistically to cause harm.'" *Rodriguez v. Cty. of Los Angeles*,

28 891 F.3d 776, 788 (9th Cir. 2018) (quoting *Hudson*, 503 U.S. at 7, 8-8 (observing

that the objective component of Eighth Amendment analysis is "responsive to contemporary standards of decency," and "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated") (citations and quotations marks omitted)); *compare Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (holding that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one").

To make out a claim of excessive force under the Eighth Amendment, a prisoner must prove an "unnecessary and wanton infliction of pain," which is not just a lack of due care but, rather, an "obduracy and wantonness." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). A corrections officer's use of excessive physical force may constitute cruel and unusual punishment even when a prisoner suffers no serious injury. *Hudson v. McMillian*, 503 U.S. 1, 4, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The key question in determining whether excessive force was used under the Eighth Amendment when a security measure is undertaken to resolve a disturbance is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 7, 112 S.Ct. 995 (citing Whitley, 475 U.S. at 320–21, 106 S.Ct. 1078 ).

If a prison officials use more than *de minimis* force, the inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320-21. The Ninth Circuit has made the distinction between *de minimis* force exerted and *de minimis injuries* sustained. *Felix v. McCarthy*, 939 F.2d 699, 702 (9th Cir. 1991) ("[I]t is not the degree of injury which makes out a violation of the eighth amendment. Rather, it is the use of official force or authority that is 'intentional, unjustified, brutal[,] and offensive to human dignity.'") Thus it is the degree and scope of the force used within the circumstances presented that is relevant, not the injuries sustained.

Plaintiff's second and third claims assert failure to intervene during the use

of excessive force and failure to train correctional officers in proper procedures. *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995) ("[A] prison official can violate a prisoner's Eighth Amendment rights by failing to intervene."); *Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014) (recognizing that the inadequacy of police training may serve as a basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (2014))

In 1995 the *Coleman* court found that "seriously mentally ill inmates [are] being treated with punitive measures by the custody staff to control the inmates' behavior without regard to the cause of the behavior, the efficacy of such measures, or the impact of those measures on the inmates' mental illnesses." *Coleman v. Wilson*, 912 F.Supp. 1282, 1320 (E.D.Cal. 1995). The court also found that "mentally ill inmates are placed in administrative segregation and segregated housing without any evaluation of their mental status, because such placement will cause further decompensation, and because inmates are denied access to necessary mental health care while they are housed in administrative segregation and/or segregated housing." *Id*. at 1320. Finally, the court found that "weapons are used on inmates with serious mental disorders without regard to the impact of those weapons on their psychiatric condition, and without penological justification." *Id*. at 1323. The Court then issued an injunction and has continued to monitor Defendants because they have stubbornly defied the Court's orders to provide specific relief, care, monitoring, treatment to class members. Defendants were on not only notice but under an injunction that their actions have been continuously found in violation of the 8th Amendment rights of the class members from 1995 until 2013 and that they owed court-ordered duties to Mr. Turner as a *Coleman* class member. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that

right.'" *Mullenix v. Luna*, --- U.S. ---, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Reichle v. Howards*, --- U.S. ---, 132 S. Ct. 2088, 2093 (2012)). A court should "not…define clearly established law at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); rather, "the dispositive question is 'whether the violative nature of particular conduct is clearly established,'" *Mullenix*, 136 S. Ct. at 308 (quoting al-Kidd, 563 U.S. at 742). Detailed court findings and an injunction to refrain from the very acts complained of is by definition an "established right".

The question here is whether the continued use of pepper spray on an unresisting mentally ill prisoner violates the 8th Amendment. *Iko v. Shreve*, 535 F.3d 225 (4th Cir. 2008) (observing that "[t]he existing case law . . . gave [Lt.] Shreve fair warning that multiple applications of pepper spray against a passive inmate who made at least some attempt at compliance, received no subsequent decontamination, and was forced to wear a spit mask, was unlawful," and that Lt. Shreve was therefore "not entitled to qualified immunity for his use of pepper spray.") Defendants do not dispute that spraying an inmate with chemical agents is an use of force. Chemical agents, like pepper spray, disable prisoners "by causing 'intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx. It sometimes also causes 'disorientation, anxiety, and panic' in the person sprayed." *Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008) (overruled on other grounds as recognized by *Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010)) (internal citations omitted). While the use of chemical agents is not excessive force per se, the amount of force used must be proportionate to the need for force and the specific characteristics of the prisoner. "It is generally recognized that 'it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain.'" *Williams v. Benjamin*, 77 F.3d 756, 763 (4th

Cir.1996) (quoting *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir.1984), cert. denied, 470 U.S. 1085, 105 S.Ct. 1846, 85 L.Ed.2d 144 (1985); *Iko v. Shreve*, 535 F.3d at 240 (4th Cir. 2008) (concluding that pain was wantonly inflicted by deploying excessive amount of pepper spray); *Treats*, 308 F.3d at 872–73 (pepper spray is not justified when an inmate only questions orders or seeks redress for an officer's actions). Here, the excessive use of pepper spray was used against a prisoner with diagnosed asthma that required dialy medication. Cf. *Blackfoot v. Mijares*, No. CV 07-6044-JVS PJW, 2011 WL 3477024, at *4 (C.D. Cal. June 27, 2011), report and recommendation adopted, No. WD CV 07-6044-JVS, 2011 WL 3476573 (C.D. Cal. Aug. 9, 2011).

The subjective component of an Eighth Amendment violation requires a finding that the defendants have a "sufficiently culpable state of mind". *Wilson*, 501 U.S. at 298. This requires the fact finder to "to assess whether the conduct at issue is 'wanton.'" *Jordan v. Gardner*, 986 F.2d 1521, 1527 (9th Cir. 1993)) The "baseline" mental state for "wantonness" is "deliberate indifference." *Id*. As a general rule, the deliberate indifference standard applies where the claim is that conditions of confinement cause unnecessary suffering. *Id*. In contrast, the "malicious and sadistic" standard applies to claims arising out of the use of force to maintain order. *See* Jordan, 986 F.2d at 1527-28). The facts here clearly will satisfy both standards. Although the use of pepper spray "may be reasonable as a general policy to bring an arrestee under control, but in a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of the weapon or a refusal without cause to alleviate its harmful effects constitutes excessive force." *LaLonde v. County of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000). Here there is no claim of resistance or violence: it would have been clear to any reasonable officer that it was unnecessary to use pepper spray to bring Mr. Turner to comply with an order he may have not even being able to comprehend, and even less necessary to repeatedly use pepper spray against him

1    when they allege that they had no idea if he was "not hanging" or unconscious.  It

2    also would have been clear to any reasonable officer that the manner in which the

3    officers used the pepper spray was unreasonable. Here Defendants Thomas used

4    full spray blasts of pepper spray to empty each container, "not just Q-tip

5    applications," despite the fact that the manufacturer's label on the canisters of

6    pepper spray defendants used "`expressly discouraged' spraying [pepper spray]

7    from distances of less than three feet." *Id*. at 240 F.3d at 1195, 1208; *Headwaters*

8    *Forest Defense v. The County of Humblod*t, 276 F.3d 1125 (9th Cir. 2002); cf.

9    *Monday v. Oullette*, 118 F.3d 1099 (6th Cir.1997) (officers may use pepper spray

10    to take custody of suspect presenting danger to himself).

11        The *Hudson*'s "good-faith effort to maintain or restore discipline" standard,

12    503 U.S. at 6, which Defendants appear to advance only sets clearly established

13    law regarding an Eighth Amendment excessive force violation "in the context of

14    quelling a prison disturbance," *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir.

15    2003). There is not a shred of evidence that such prison disturbance was afoot:

16    Defendants' own testimony is that they had no "proof of life" and this was the

17    reason that caused them to assemble a cell extraction. On the other hand, any

18    reasonable officer would have known in 2010 that the malicious and sadistic use of

19    force in responding to even a prison disturbance violated the Eighth Amendment.

20    *Hudson*, 504 U.S. at 4 (holding that officers violated the Eighth Amendment where

21    one officer "punched Hudson in the mouth, eyes, chest, and stomach while

22    [another officer] held the inmate in place and kicked and punched him from

23    behind"). In *Martinez*, a case directly on point, the plaintiff claimed that he had

24    covered his cell door with a bed sheet in order to prevent pepper spray fumes from

25    entering the cell during a prison disturbance. *Id*. 323 F.3d at 1180.

26        Because the ultimate factual issues are in dispute, the jury must be instructed

27    that it must consider whether (1) Defendants used excessive and unnecessary force

28    under all of the circumstances; (2) they "acted maliciously and sadistically for the

1    purpose of causing harm"; and (3) their caused harm to Plaintiff. Once these

2    factual issues are resolved, the Court not the jury must decide the legal issues

3    regarding qualified immunity.

4                                  Respectfully submitted

5                                  *s/Nicolette Glazer*

6                                  Nicolette Glazer Esq.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28